UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| KELVIN F. T., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:18 CV 56 (JMB) |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Deputy Commissioner of Operations, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

### **I. Procedural History**

On January 30, 2015, plaintiff Kelvin F. T. protectively filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of January 1, 2012.[1] (Tr. 167-70, 106). After plaintiff's application was denied on initial consideration (Tr. 104-08), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 119-20).

Plaintiff appeared for a video hearing on August 1, 2016. (Tr. 69-104). The ALJ informed plaintiff of his right to be represented by counsel and gave him the opportunity to postpone the hearing so that he could obtain representation. Plaintiff elected to proceed without

---

[1] Supplemental security income is not payable prior to the month following the month in which an application is filed. 20 C.F.R. § 416.335. Thus, the relevant date is January 30, 2015.

counsel.[2]  (Tr. 72; 164).  Plaintiff testified concerning his disability, daily activities, functional limitations, and past work.  The ALJ also received testimony from vocational expert Janice S. Hastert, M.S.  The ALJ issued a decision denying plaintiff's applications on January 26, 2017.  (Tr. 10-19).  The Appeals Council denied plaintiff's request for review on January 12, 2018.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff, who was born on May 15, 1964, was 47 years old on the alleged onset date.  He lived with his girlfriend, who received disability.  (Tr. 78).  He left school in the eighth grade when his mother died.  Prior to leaving school, he had been in regular education classes.  (Tr. 76-77).  He took the GED test twice without success, failing once by "a tenth of a point in reading comprehension."  He did not have any vocational training.  He was incarcerated in 2005 and 2006 and had a 90-day placement as a conveyor off-loader at a gift-wrapping company through a prison work release program.  (Tr. 79-80, 101).  Between 2011 and 2013, he worked as a laborer for a friend with a roofing business.  (Tr. 80-81).  He stopped working in mid-2013 because he had problems with his blood pressure, heart, back, vision, and hearing.  (Tr. 81).  His driver's license had been revoked for an unpaid speeding ticket and he could not afford to have it reinstated.  (Tr. 78-79).  He and his girlfriend relied on a neighbor for transportation.

Plaintiff listed his impairments as heart problems, high blood pressure, and poor eyesight.  (Tr. 199).  He was prescribed medications to treat high blood pressure, and unspecified pain and cardiac problems.  (Tr. 201).  He testified that he had never consumed alcohol and did not take

---

[2] Counsel was appointed to plaintiff in February 24, 2017.  (Tr. 35).  Appointed counsel filed a request for review with Appeals Council.  (Tr. 166).

2

any drugs that were not prescribed to him.[3]  (Tr. 90).  He smoked three cigarettes a day.  (Tr. 90).  The agency representative completed a face-to- face interview with plaintiff and, as relevant to the issue raised here, observed no difficulties in hearing, reading (with the exception of needing reading glasses), understanding, coherence, or concentration.  (Tr. 196).

In March 2015, plaintiff completed two function reports with the help of his girlfriend.  (Tr. 210-20; 221-35).  He reported that he was unable to work due to a weak heart, pain in his lower and middle back, and poor vision.  He also had significant hearing loss.  He stated that he spent his days watching television.  His household chores consisted of sweeping floors and washing dishes and he was learning how to cook.  He occasionally went to the grocery store.  He could walk only 20 steps before he had to rest for five minutes or "until the pain subside[d]."  (Tr. 215).  He had heart palpitations that interfered with his sleep.  He was able to manage financial accounts.  He was able to follow spoken instructions "perfectly well" but had some difficulty with written instructions.  He stated that he could pay attention for three hours.  Plaintiff had difficulties with lifting, squatting, bending, standing, walking, kneeling, hearing, climbing stairs, seeing, and concentrating.   He did not get along well with authority figures and had been fired from a job because of interpersonal problems.  He had difficulty handling stress and changes in routine.  In a function report completed in May 2015, plaintiff reported that his high blood pressure caused him to feel dizzy and nauseated all day, with occasional delirium.  (Tr. 245).  He could not afford medication.  In addition, he experienced headaches, low back pain, and a weakened cardiac valve.

Plaintiff testified that he was being treated by a cardiologist and was prescribed medication to treat heart problems, high cholesterol, and blood pressure.  (Tr. 82-84).  He felt

---

[3] Plaintiff reported to Elizabeth A. Huenefeldt, APRN, FNP-C, of Cardiovascular Consultants, that he had had a 30-year history of smoking crack cocaine and that he had stopped all use in March 2016.  (Tr. 322).

lightheaded and dizzy if he did not take his blood pressure medication, but he felt okay when he did take it. (Tr. 88). He had a history of muscle spasms in his shoulder and back. (Tr. 84-86). He was able to stand for about an hour and sit for 30 to 45 minutes before he needed to change positions to relieve his low back pain. (Tr. 90-91). He was able to walk about half a mile before he had to rest due to a breathing problem. He thought he could lift or carry about 50 pounds. (Tr. 92). He had some numbness in his left index finger. (Tr. 93). He required help shaving because his hands shook. (Tr. 94). In addition, he had cataracts in both eyes and required reading glasses. He had not yet been seen by an eye doctor, but could see clearly when he wore his glasses. (Tr. 88-89). When asked if he had any problems with depression or anxiety, plaintiff testified that he had problems remembering where he put things like his wallet. (Tr. 94). Plaintiff identified his back and his vision as the biggest barriers to fulltime employment. (Tr. 97). In the two weeks before the hearing, he had joined a church and done some yard work and painting for the minister. (Tr. 96-97).

Vocational expert Janice Hastert was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was limited to light work; who needed to avoid concentrated exposures to moving machinery and unprotected heights, and all exposure to environmental hazards; and who was limited to simple, routine, repetitive tasks with no constant motion or production rate tasks. (Tr. 102). According to Ms. Hastert, such an individual would not be able to perform plaintiff's past work as a conveyor off-loader. Other work would be available in the national economy, such as collator, linking machine operator, and garment sorter. (Tr. 102-03). Ms. Hastert testified no work in the national economy would be available to an individual who required an additional 15 minute break each day. (Tr. 103).

B. **Medical Evidence**

In February 2015, plaintiff was treated at the Poplar Bluff Medical Center emergency department for an episode of elevated blood pressure. (Tr. 269-79). He reported that he was prescribed blood pressure medication but that he had forgotten to bring it with him when he moved to the area two months earlier. Plaintiff was treated and released with instructions to take medication. At discharge, it was noted that plaintiff's blood pressure was "moderate" at its worst. (Tr. 278). An echocardiogram (ECG) showed possible left atrial enlargement and sinus rhythm with first-degree AV block and was characterized as "borderline." (Tr. 283).

Plaintiff underwent a consultative examination with Chul Kim, M.D., on April 22, 2015. (Tr. 289-96). His chief complaints were poor vision and an unspecified heart problem, although he also had a recent episode of pain in his right upper chest and right arm. Plaintiff reported that his heart problems were discovered in September 2013 when he sought treatment for a spider bite. He stated that, although he had been prescribed medication to treat all his conditions, he could not afford them all and only took pain medication. On examination, Dr. Kim noted that plaintiff's visual acuity was 20/25 for the right eye and 20/30 for the left eye, without glasses and there were no noticeable deficits in plaintiff's hearing. Plaintiff had a regular heart rhythm with a grade 3 systolic murmur in the apex. His lungs were clear and he was not in respiratory distress. On mental status evaluation, Dr. Kim noted that his mental state was clear with good memory. Evaluation of plaintiff's joints and extremities revealed no abnormalities and his neurological examination was "nonspecific." Dr. Kim's impression was heart murmur with shortness of breath on exertion, uncontrolled hypertension, presbyopia, and recent development of right anterior chest pain, of undetermined cause.

On April 5, 2016, plaintiff sought emergency treatment for chest pain. (Tr. 350-67). A chest x-ray showed no acute cardiopulmonary disease. The following day, plaintiff saw Elizabeth Huenefeldt, APRN, FNP-C, of Cardiovascular Consultants. (Tr. 322-24). He reported that he had stopped using crack cocaine two weeks earlier. He also stated that an ECG three years earlier showed that "half his heart wasn't pumping" blood very well. An ECG again showed sinus rhythm with first degree AV block but was otherwise unremarkable. (Tr. 317). Ms. Huenefeldt's impression was that his recent episode of chest pain was related to GERD, but noted that he had significant risk factors for cardiac disease. She prescribed Tribenzor to treat benign essential hypertension and scheduled him to return for further evaluation. On April 13, 2016, plaintiff reported that he continued to abstain from drug use and had not had any further episodes of chest pain. (Tr. 319-21). An echocardiogram showed a strong ejection factor and no evidence of drug-induced cardiomyopathy. Plaintiff's blood pressure was well-controlled on Tribenzor. Ms. Huenefeldt suggested that plaintiff find a primary care physician. One month later, plaintiff again reported that he had no further episodes of chest pain and continued to abstain from drug use. (Tr. 313-15). He complained of vision change, hearing loss, sweating, and shortness of breath when lying flat. He also had reflux. Ms. Huenefeldt's impression was benign hypertension, well-controlled with medication. She directed him to see a cardiologist in six months.

On June 17, 2016, plaintiff was diagnosed with trapezius strain and muscle spasm. (Tr, 330-35).

### 2. Opinion evidence

On June 29, 2016, Price Gholson, Psy.D., performed a consultative examination of plaintiff. (Tr. 304-10). Plaintiff reported a history of school suspensions and arrests. His chief

6

psychological complaint was anxiety about his health, but he also reported some sleep disturbance, memory problems, isolation, and some signs and symptoms of PTSD. He described his mood as usually "normal." (Tr. 306). His concentration was fair. He had unspecified difficulty getting along with others. He had never been treated for psychological conditions or complaints but was presently taking Valium for anxiety. Dr. Gholson's diagnostic impression was rule out PTSD, with a Global Assessment of Functioning (GAF) score of 60. On mental status examination, plaintiff had appropriate affect and mood and was oriented. His recent and remote memory were below average. He had an average ability to abstract, perform word reversals, and make change for a dollar. He performed poorly on the serial 7s task. He also had average intellectual and emotional insight, and average organizational ability in goal striving with below average appropriateness of goal setting. Dr. Gholson found that plaintiff had average verbal behavior and average attention and concentration and surmised that his general intelligence was normal.[4]

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to

---

[4] For the category "General Intelligence," Dr. Gholson placed a question mark on the line indicating "Average/Satisfactory." (Tr. 309).

do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.[5] Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the

---

[5] Plaintiff cites Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998), for the proposition that the "'substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard," which requires the reviewing court to "take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Doc. # 21 at 5. The Eighth Circuit has subsequently clarified that, when completing "this substantial-evidence determination, the entire administrative record is considered but the evidence is not reweighed." Byes v. Astrue, 687 F.3d 913, 915 (8th Cir. 2012).

9

reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

### IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff had not engaged in substantial gainful activity since January 30, 2015, the application date. (Tr. 12). At steps two and three, the ALJ found that plaintiff had severe impairments of hypertension, atypical chest pain, history of left shoulder surgery, left trapezius strain, and anxiety. The ALJ found that plaintiff's alleged poor vision was not severe. The ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 12-13). The ALJ found that plaintiff's mental impairment did not meet the criteria for listing 12.06 (anxiety disorders). (Tr. 12). For the purposes of considering the paragraph B criteria for mental impairments, the ALJ found that plaintiff had mild limitation in his abilities to understand, remember and apply information; to interact with others, and adapt or manage himself. He had moderate difficulties in maintaining concentration, persistence, and pace. Plaintiff had no episodes of decompensation of extended duration. (Tr. 13).

The ALJ next determined that plaintiff had the RFC to perform light work, could occasionally lift or carry up to 20 pounds and frequently lift or carry 10 pounds. He was able to walk or stand up to 6 hours and to sit up to 6 hours in an 8-hour work day. He should avoid concentrated exposure to work and environmental hazards. He was limited to simple routine

repetitive work tasks and no production rate (constant motion) work tasks. (Tr. 14). In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's statements regarding his abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent" with the medical and other evidence. (Tr. 15).

At step four, the ALJ concluded that plaintiff was unable to perform any past relevant work. (Tr. 17). His age on the application date placed him in the "closely approaching advanced age" category. He had a limited education and was able to communicate in English. Id. The transferability of job skills was not material because plaintiff's past relevant work was unskilled. The ALJ found at step five that someone with plaintiff's age, education, work experience, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a collator, linking machine operator, and a garment sorter. (Tr. 18-19). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from January 30, 2015, the alleged onset date, through January 26, 2017, the date of the decision. (Tr. 19).

## V. Discussion

Plaintiff argues that the ALJ violated her duty to fully and fairly develop the record with respect to his intellectual functioning and should have ordered a consultative examination of his IQ.

The administrative hearing is not an adversarial proceeding. Cox v. Apfel, 160 F.3d 1203, 1209 (8th Cir. 1998). Thus, an ALJ has a duty to fully and fairly develop the evidentiary record. Byes v. Astrue, 687 F.3d 913, 915–16 (8th Cir. 2012). This duty "is enhanced when the claimant is not represented by counsel," Cox, 160 F.3d at 1209, and the failure to develop the record is reversible error if there is not sufficient evidence in the record to determine the impact of an impairment on a claimant's ability to work, Byes, 687 F.3d at 916. The duty only arises, however, if a crucial issue is undeveloped. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). A claimant must show that the ALJ's failure to fully develop the record resulted in prejudice before remand will be warranted. Id. Where the failure to develop concerns a "central and potentially dispositive issue" which the ALJ failed to explore, remand is required. Snead v. Barnhart, 360 F.3d 834, 839 (8th Cir. 2004). But the ALJ's "duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

In this case, there was no reason to suspect that plaintiff had an intellectual impairment requiring an IQ examination. First, he did not allege that he had mental limitations when he applied for benefits. In his function reports, he stated that he could follow spoken instructions "perfectly well" and he did not check the box indicating that he had difficulty understanding. Furthermore, no health provider ever indicated that plaintiff had limitations in understanding instructions or medications. Dr. Gholson surmised that plaintiff's general intelligence was average, and he had an average ability to abstract, average intellectual and emotional insight, and average organizational ability in goal striving. Similarly, the agency representative observed no impairment in plaintiff's abilities to comprehend, read, write, or concentrate.

Plaintiff argues that there was evidence in the record from which the ALJ should have concluded that his intellectual functioning was low. On appeal, plaintiff cites the fact that he left school in the eighth grade. He testified, however, that he left school because he became depressed after his mother died, not because of any intellectual impairment. Further, there is no evidence that he had been assessed for or received special education services. Thus, plaintiff's educational record does not present a basis for concluding that he required IQ testing. Plaintiff also notes that he failed the GED exam twice. Again, however, he testified that he nearly passed the test the second time he took it. Finally, plaintiff told the ALJ at the hearing that he had received the computer disc containing his medical records but that he had been unable to get the disc to open. He testified that he followed the instructions to open it but he "couldn't get it to do anything." The ALJ offered to send him another disc in case the one he received was defective. He agreed that would be "fine." (Tr. 73-74). Plaintiff did not state that he was unable to follow the instructions and thus there is no basis for concluding that the issue with the disc was anything other than a technical problem.

Plaintiff has failed to establish that there was evidence in the record from which the ALJ should have known that further development of his intellectual capacity was required.

\* \* \* \* \*

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

                                        /s/ *John M. Bodenhausen*
                                        JOHN M. BODENHAUSEN
                                        UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of January, 2019.